[No. A048033. First Dist., Div. Two. Dec. 5, 1991.]

ESTATE OF ABRAHAM L. GUMP, Deceased.
WELLS FARGO BANK, as Trustee, etc., Petitioner and Appellant, v.
ROBERT L. GUMP et al., Objectors and Respondents.

584

586

COUNSEL

Karen Johnson-McKewan for Petitioner and Appellant.

Goldstein & Phillips, Alvin H. Goldstein, Jr., Mark L. Musto, Monte Travis, Edward P. Nelson and Edward F. Pearson for Objectors and Respondents.

OPINION

KLINE, P. J.—

### Introduction

Appellant Wells Fargo Bank, N.A. (Wells Fargo), the testamentary trustee of several trusts created under the will of Abraham L. Gump from December 11, 1969, to July 17, 1979, appeals from the judgment settling the ninth, tenth and supplemental accounts and reports of the trustee.[1] The judgment disallowed the bulk of Wells Fargo's requested compensation, including reimbursement for attorney fees incurred during the periods of the ninth, tenth and supplemental accounts (also referred to collectively as the "final accounts") on the bases of Wells Fargo's negligent and intentional breaches of trust and fiduciary duty, intentional misconduct constituting actual, constructive and statutory fraud against the beneficiaries, and on the ground that the will of Abraham Gump prohibited Wells Fargo from claiming extraordinary compensation, attorneys' fees and expenses incurred in defending beneficiaries' claims arising from such maladministration.

Specifically, judgment was entered in favor of beneficiaries, denying Wells Fargo's claim to ordinary and extraordinary trustee's fees and costs incurred during the ninth, tenth and supplemental accounts in the amount of approximately $91,570 and denying its claim for compensation for ordinary and extraordinary attorneys' fees and disbursements totalling $79,678.13. The court also refused to retain jurisdiction to consider a supplemental petition for reimbursement of fees for extraordinary services provided by a successor law firm. The court allowed ordinary trustee's fees of $3,769.33 incurred in connection with transfer of the trusts to a successor trustee. Finally, the court denied beneficiaries' claims to surcharge their attorneys' fees in the sum of $50,000, but retained jurisdiction to consider an application by beneficiaries for their attorney fees and costs.

---

[1]The objectors were Robert L. Gump, Marcella Gump Curley, Suzanne Gump Mallory, Melanie Eve Arens, Marilyn Gump Montague, and Antoinette Gump Williams. By the time the judgment was entered, Robert L. Gump and Marcella Gump Curley had died. (*Gump* v. *Wells Fargo Bank*▉ (Cal.App.).) Apparently, appropriate representatives of their estates were substituted as parties. The judgment itself refers to "contestants" Mallory, Arens, Montague, Williams, and Richard Gump. Plaintiffs herein are sometime referred to collectively as "the beneficiaries."

We shall affirm in part and reverse in part.

## Procedural Background

This appeal is the fourth appeal in litigation between Wells Fargo and the beneficiaries over Wells Fargo's administration of the Gump trusts and, in particular, its management of the principal income generating asset of the trust, "a 60.41 percent interest in real property at 250 Post Street leased to the venerable San Francisco business firm known as Gump's retail store." (*Estate of Gump* (1982) 128 Cal.App.3d 111, 114 [180 Cal.Rptr. 219].)[2]

At the conclusion of each year of its administration of the Gump trusts, Wells Fargo filed petitions for settlement of its accounts of administration, reporting the amount of rent collected under the Post Street lease and paid out to the beneficiaries that year. The court entered decrees approving and settling the first through fifth accounts for the administration of the Gump trusts from December 12, 1969, through December 11, 1974. In 1976, a dispute arose between the beneficiaries and Wells Fargo concerning the sixth account. Subsequently, a settlement was reached between the parties whereupon the superior court entered its order settling the sixth and seventh accounts.

### The Eighth Account Litigation

On May 19, 1978, Wells Fargo petitioned for settlement of its eighth account. On June 22, 1978, all of the beneficiaries except Antoinette filed exceptions to that account in the probate proceeding, alleging, among other things, that Wells Fargo had failed and refused to properly administer the Post Street lease. The eighth account litigation resulted in a determination by the trial court that Wells Fargo's administration of the Post Street lease had been negligent for the year 1977 and a disallowance of a $22,689 fee for ordinary services requested by Wells Fargo. An appeal resulted in reversal, in part, of the order disallowing the fee because the record failed to disclose the evidentiary basis for the lower court's disallowance in an amount greater than that attributable to the mismanaged lease. (*Estate of Gump, supra,* 128 Cal.App.3d 111, 117.)

### The Civil Litigation

On June 30, 1978, shortly after filing their exceptions to the eighth account in the probate proceedings, the beneficiaries filed a complaint in the

---

[2]The three prior appeals are: *Estate of Gump, supra,* 128 Cal.App.3d 111 (also referred to as the "eighth account litigation"); *Gump* v. *Wells Fargo Bank█* (Cal.App.), *supra,* [see fn. 1, *ante,* p. 587] (*"Gump I"*); and *Gump* v. *Wells Fargo Bank* (May 3, 1990) A042720 [nonpub. opn.] (*"Gump II"*). The action underlying *Gump I* and *Gump II* is referred to as "the civil litigation."

superior court charging Wells Fargo with misconduct in the administration of the trusts during the entire period of its administration and seeking compensatory and punitive damages.[3]

In relevant part, the trial court found that during the period of the first seven accounts (from Dec. 12, 1969, through Dec. 31, 1976[4]) Wells Fargo had negligently and intentionally breached its fiduciary duties in connection with the administration of the lease property. Because Wells Fargo had failed to disclose the facts establishing its nonadministration and nonenforcement of the lease to beneficiaries or in the probate proceedings, the court found actual fraud, extrinsic to the annual accountings sufficient to prevent the closing of the accounts from having res judicata effect on the assertion of beneficiaries' claims in the civil action. With respect to the period of the eighth accounting, the court took judicial notice of *Estate of Gump, supra,* 128 Cal.App.3d 111, finding Wells Fargo guilty of negligence only. That decision was determined to be res judicata as to the assertion of fraud in the administration of the Gump trusts during 1977. The trial court awarded compensatory damages for lost rent from 1969 to 1977, awarded punitive damages of $1 million, and refused to award damages for lost rent during 1978 and 1979 (the ninth and tenth account periods) finding beneficiaries' failure to pursue collection of past due rent after Wells Fargo's suspension as trustee on July 17, 1979, reflected unclean hands.

On appeal, we held in relevant part that the decrees rendered in the probate proceedings approving the first seven accounts were res judicata as to belated claims for damages based upon maladministration of the 250 Post Street lease. (*Gump I, supra.*)[5] We concluded that the finding of extrinsic fraud was not supported by substantial evidence, as there was no evidence that Wells Fargo intended to deceive appellants in connection with the administration of the lease or was even aware of the errors in rent collection until the fall of 1977, the period of the eighth account. (*Ibid.*) We also held that "the boilerplate provisions in Wells Fargo's accounts regarding faithful conduct and management of the trusts cannot be deemed to constitute extrinsic fraud. There is abundant evidence Wells Fargo was negligent in administering the lease. There is no substantial evidence, however, that it engaged in extrinsic fraud." (*Ibid.*) Hence, the trial court erred in exercising its equitable jurisdiction to set aside the orders and decrees of the probate proceedings settling those accounts. As all claims supporting the award of

---

[3]Although Antoinette did not originally join in the suit, she joined as a plaintiff by an amendment filed July 11, 1979.

[4]Wells Fargo became the successor trustee on December 11, 1969.

[5]The California Supreme Court ordered our partially published opinion in *Gump I* unpublished on August 13, 1987 (see *ante,* p. 587).

punitive damages were barred by res judicata by virtue of the probate orders approving the first seven accountings, we reversed the punitive damages award. (*Ibid.*)[6]

### The Proceedings Below

Wells Fargo's powers were suspended on July 17, 1979, and its resignation was accepted on November 29, 1979. The Chartered Bank of London was appointed custodian of assets for the Gump trusts on July 17, 1979, and was appointed successor trustee on January 11, 1980. On February 19, 1980, Wells Fargo filed its "ninth, tenth, and supplemental accounts and reports of successor trustee," a "petition for settlement thereof and for allowance of compensation to trustee and for attorneys for trustee." On April 11, 1980, beneficiaries filed their contests and objections to these final accounts and reports, challenging Wells Fargo's entitlement to trustees fees, costs, and reimbursement of attorneys' fees. Beneficiaries' then pending civil action (*Gump I, supra*) was subsequently ordered consolidated with the proceedings regarding the final accounts by order dated July 3, 1980. On the eve of trial of the civil action the trial court deferred the resolution of issues concerning the final accounts, as a matter of order of proof pending determination of the civil action while allowing the taking of evidence on common issues of fact in the two proceedings. The court subsequently stayed further proceedings on the final accounts pending appeal of the civil action. After the issuance of our opinion in *Gump I, supra,* and while the further appeal of the civil action (*Gump II, supra*) was pending, Wells Fargo moved to lift the stay of proceedings concerning the final accounts and to refer the matter to the probate department. The court lifted the stay, but because of its familiarity with the record and the credibility of witnesses, retained jurisdiction to determine the propriety of the final accounts. Following exhaustive briefing of the issues and evidence, trial began on September 5, 1989, with the court taking the matter under submission the next day. On November 3, 1989, the court entered its judgment and accompanying statement of decision. This timely appeal by Wells Fargo followed.

### Statement of Facts

The trial court found that during the ninth and tenth accounts (Jan. 1, 1978, through Dec. 31, 1978, and Jan. 1, 1979, through July 31, 1979), Wells

---

[6] On beneficiaries' cross-appeal, we remanded for a determination by the trial court as to whether certain documents as to which Wells Fargo asserted the attorney-client privilege should have been disclosed to the beneficiaries, to allow beneficiaries to pursue additional discovery prompted by new information disclosed, if any, and to determine whether any newly afforded discovery led to evidence requiring a retrial, in whole or in part. (*Ibid.*) On remand, the trial court entered judgment for Wells Fargo. Beneficiaries appealed. We affirmed in a nonpublished opinion. (*Gump II, supra.*)

Fargo failed to properly administer and enforce the 250 Post Street lease. In brief, Wells Fargo continued the incompetent administrative practices and lax enforcement of lease provisions that had been the basis for the trial courts' findings of negligence in the preceding eighth account litigation (*Estate of Gump, supra,* 128 Cal.App.3d 111) and the civil litigation (*Gump I*). Wells Fargo did not attempt to redress its maladministration until after the trial court's intended decision in the eighth account litigation on March 9, 1979, midway through the period of the tenth account.

Thereafter, Wells Fargo failed to disclose and attempted to conceal its earlier maladministration. The trial court found that the continued maladministration of the lease, notwithstanding the beneficiaries' objections, constituted knowing, willful and intentional breaches of trust (including threatened breach of trust) and fiduciary duty. The court found that Wells Fargo had fraudulently misrepresented its competence by concealing and failing to disclose its incompetence to administer the lease despite its knowledge of its incompetence after discovery of errors in the accounts. The trial court found that Wells Fargo's threat of an audit to be charged to the accounts of the objecting beneficiaries constituted fraud, as well as a breach of trust, and found Wells Fargo's intentional misrepresentations of its competence and good faith administration in the petition to settle the ninth and tenth accounts to constitute an attempted fraud on the court.

Respondents' accountant, Victor Levi, testified that numerous errors were found in the rent statements for prior account periods. For example, rent statements for 1977 (the period of the eighth account) erroneously reported the amount of credit given beneficiaries for Northern California trading area catalog sales. Wells Fargo employees charged with overseeing administration of the lease property testified that during the ninth and tenth account periods they had questions about the rent statements for the prior periods and the interpretation of the lease provisions, but that they took no remedial action, despite the beneficiaries' objections. Levi testified that Wells Fargo failed to detect, acknowledge or remedy miscalculations of rental income during the entirety of its trusteeship (including the ninth and tenth account periods).

Doris Domeney, the trust real estate officer responsible for administering the lease from April 1977 through June 1978, testified that she had difficulty understanding the rental calculations and was unclear how totals for catalog and mail order sales were derived. She discussed this with Knud Laurlund, her supervisor, but was still not satisfied. In January 1978, nine months after assuming her responsibility for the lease administration, she and Laurlund met with Gump's controller, Charles Ling, to discuss the matter. She and

Laurlund were satisfied with Ling's explanation of the rent statements. Domeney and Laurlund looked at various records at that meeting, but neither the skills nor ability to analyze them.[7] They simply accepted Ling's unsupported statement that the records were kept according to generally accepted accounting principles, as required by the lease, admitting they were not competent to question this statement. Laurlund stated he believed the record-keeping was adequate. However, he also testified he was not competent to render an opinion on the adequacy of Gump's bookkeeping, but acknowledged that it was not possible to look at the books and obtain an accurate picture of how they were kept.

Wells Fargo did not seek to verify figures in the 1977 rent statement and did not discuss the issue with any accountant. Neither Laurlund nor Domeney took any action to obtain the advice or assistance of an accountant or other qualified expert to review the records, lease, or rent statements until after the beneficiaries questioned the rent statements. Thereafter, Laurlund suggested they consider an audit.

Levi testified that prior to 1979, Gump's did not maintain adequate records and that, as a result, underpayments of rent occurred from 1969 to 1979. John Forbes & Co. (Forbes), auditors employed by Wells Fargo to assist in their defense of the eighth account and civil litigation, concluded they were unable to express an opinion on the correctness of the rent statements submitted by the lessee because of inadequate recordkeeping. Laurlund admitted that the matters which caused Forbes difficulty in conducting the audit had not been corrected by the time Wells Fargo's powers as trustee were suspended.

After meeting with Ling, Laurlund reported back to Wells Fargo's attorneys, but provided no advice to the beneficiaries. Although Laurlund was trust administrator, he claimed it was the trust real estate department's responsibility to resolve problems with the lease. Both Laurlund and Domeney stated they would not inquire into the adequacy of the rent statements unless a specific problem was brought to their attention. Laurlund admitted Wells Fargo did not have the expertise to determine if the rent statement in fact complied with the lease, but he never informed the beneficiaries of this. Moreover, in a letter dated February 3, 1978, Laurlund represented to the beneficiaries that they could rely on Wells Fargo's statements.[8] Wells Fargo represented in verified probate petitions for the eighth and final accounts that

---

[7] Nor did Domeney or any other Wells Fargo employee spot a patent error involving transposition of numbers in the 1977 rent statement.

[8] "Please rest assured that you can rely on our statements. The December statement is correct in all respects." (Letter from Laurlund to Robert L. Gump.)

the bank " 'faithfully managed and conducted the [Gump] trusts strictly in accordance with the terms thereof' "; and " 'performed services pertaining to the management and administration of the trusts including the care and custody of the assets comprising the principal of the trust, collection and disbursement of income, [and] periodic analysis of the trust assets . . . .' " (Trial court statement of decision.)

Despite Wells Fargo's discovery in the fall of 1978 of the lessee's computer error resulting in $2,700 in unpaid rent, Wells Fargo did nothing to enforce this obligation until the probate court rendered its memorandum of intended decision against Wells Fargo on March 9, 1979, during the 10th account. Only then did Laurlund advise the lessee to begin keeping records in accordance with the requirements of the lease. Only then did Wells Fargo recognize "potential areas of the [rent] statement which may deviate from the lease . . ." and require the lessee to revise its statement to conform with the specific lease provisions. (Apr. 3, 1979, letter, Martiniak to Fewster.) Even then Wells Fargo's discussions with the lessee were limited to questions of future lease administration and did not include a demand for past due rent. On May 4, 1979, during the 10th account, Wells Fargo received the Forbes audit report quantifying an amount of past due rent, but made no effort to demand payment thereof from the lessee for two more months.

*Audit Threat*

In April 1978, after the beneficiaries had questioned the rent figures, Laurlund first advised them of Wells Fargo's intent to seek an audit. Laurlund repeatedly claimed the only way to resolve any problems with the lease was through a full-blown audit because he could not informally review the lessee's records. However, Laurlund never asked to review the records which Ling testified were readily available.

On June 15, 1978, Laurlund advised the beneficiaries the audit would cost approximately $10,000 and would be paid from the trust income. This assertion was made despite Domeney's questioning whether the beneficiaries would recognize an audit expense against the trust.

On June 22, 1978, beneficiaries filed their contests and objections to the eighth account. Laurlund was aware that Antoinette Gump had not joined in the suit. The beneficiaries opposed the proposed audit, arguing it was not required to determine the inadequacy of Gump's recordkeeping and that it should be undertaken only as a remedial measure at Wells Fargo's expense. While Antoinette did not join the contest and objections to the eighth account, on July 24, 1978, she notified Wells Fargo that she, too, could not

approve of the audit in that the accuracy of the rent statements was Wells Fargo's responsibility as trustee and that the audit was likely to prove futile in light of the lessee's inadequate recordkeeping. On August 1, 1979, Wells Fargo notified the beneficiaries that it would undertake the audit despite their objections and would charge the income of the objecting beneficiaries *only*. Laurlund wrote to Antoinette in late August, reiterating that the bank sought the audit as part of its defense and would seek to allocate its expense solely to the objecting beneficiaries. On August 25, 1979, Laurlund instructed Forbes to proceed with the audit.[9]

Although Wells Fargo claimed the audit was necessary to resolve problems with the lease, there is ample evidence supporting the court's determination that the audit was primarily motivated by its anticipated utility in the eighth account and civil litigation.[10] The evidence supports the court's findings that Wells Fargo improperly threatened the audit: "(1) in an attempt to cover up Wells Fargo's maladministration of the lease during the period of the final accounts; (2) to charge the cost of said audit solely to the beneficiaries who objected to Wells Fargo's petition to settle the Eighth account; (3) in an effort to shift Wells Fargo's litigation costs to the objecting beneficiaries; and (4) to pressure the objecting beneficiaries into dropping their contests and objections to the Eighth account."

Byron H. Brown, Sr., an expert in trust administration, opined that the conduct of the trust administrators, including Doris Domeney, the trust officer for the leased property during the first half of the ninth account, was "highly unprofessional" and fell below the standard of care for professional trust managers. As an example, he cited the failure to obtain certification of rent statements until 1979, after the probate court sustained the beneficiaries' contests and objections to the eighth account, as a breach of the standard of care. Further, he opined that it was wholly inappropriate to contemplate charging some, but not all beneficiaries for the audit and to arbitrarily charge the beneficiary accounts with the audit without first obtaining court approval.

---

[9] Three months later, Laurlund prepared a letter to the beneficiaries informing them that the expense of the uncompleted audit had been paid from income of the five objecting beneficiaries. Although it appears the letter was not sent and that the charge to income was not actually made at that time, such a charge to income would have been premature and made without necessary court approval.

[10] A statement for professional services performed during the ninth account included: "arrangement for audit of Gump's financial records; preparation for hearing on eighth account, including conference with auditor . . . ."

## I.

*Substantial evidence of negligence and breach of trust during the ninth and tenth accounts supports reduction or denial of compensation for services rendered in connection with the lease property.*

### A. *Negligence.*

■ Substantial evidence supported the trial court's determination that Wells Fargo's maladministration of the lease property during the ninth and tenth accounts was negligent and in breach of trust.[11] Evidence was presented demonstrating that during the period of the ninth and tenth accounts, Wells Fargo continued in the course of conduct previously determined negligent in *Estate of Gump, supra,* 128 Cal.App.3d 111, and that, among other things, it: (1) failed to vigorously monitor and enforce the rent provisions of the lease during that period; (2) failed to demand lessee's compliance with the terms of the lease, including certification of rent statements, until the intended decison in the eighth account litigation; (3) failed to require the lessee to maintain records and accounts in accordance with generally accepted accounting principles (as required by the lease), which are necessary to insure accurate computation of rents; (4) failed to monitor properly the sales records of the lessee; and (5) failed to obtain necessary assistance despite its knowledge that it was not competent to monitor the accuracy of the rental statements or recordkeeping. Trust administration expert Brown opined that the conduct of Wells Fargo's trust administrators in so administering the trusts was "highly unprofessional" and did not meet the standard of care for a professional trustee.

### B. *Negligence constitutes a breach of trust by virtue of Probate Code section 16400.*

Negligence, which is the failure to meet the standard of care, is also a breach of trust by virtue of Probate Code section 16400.[12] That section provides: "A violation by the trustee of any duty that the trustee owes the beneficiary is a breach of trust."[13] This section adopts the language of the

---

[11]The trial court found no evidence of misconduct by Wells Fargo from August 1979 (following its suspension as trustee) through October 1979—the period of the supplemental account.

[12]All further statutory references are to the Probate Code unless otherwise specified.

[13]Section 16400 was one of a series of sections adopted in 1986 as part of a major revision of the Probate Code. As the trial court correctly found, these sections apply to the conduct at issue which predates their adoption. Section 15001 provided:

"Except as otherwise provided by statute:

Restatement Second of Trusts section 201.[14] Among the duties of the trustee is the duty to administer the trust and to manage trust property "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims to accomplish the purposes of the trust as determined from the trust instrument." (§ 16040, subd. (a); see also § 16000.)

Consequently, Wells Fargo's negligence in administering the lease property amounted to a breach of trust, as well. Moreover, the evidence before the trial court supports its determination that Wells Fargo's breaches of trust were knowing and intentional, as well as negligent.

Certainly, the testimony of Domeney and Laurlund demonstrates that they continued to improperly administer the trust property, accepting the lessee's explanations of its business practices despite their awareness that they did not have the skills to determine the accuracy of the rent statements, the adequacy of the lessee's bookkeeping, or whether the lessee's business practices conformed with lease provisions. Nor did they advise the beneficiaries of their incompetence, but rather persisted in assuring the beneficiaries that they could rely on Wells Fargo's statements.

Furthermore, by threatening objecting beneficiaries that the substantial expense of an audit would be charged solely to their income shares in an attempt to pressure the beneficiaries into dropping their contests and objections to the eighth account, Wells Fargo committed a knowing breach of trust, as well as a breach of its duty of loyalty. (§ 16002, subd. (a); former Civ. Code, § 2228; Rest.2d Trusts, *supra*, § 170(1).)[15]

"(a) On and after July 1, 1987, this division applies to all trusts regardless of whether they were created before, on, or after July 1, 1987,

"(b) On and after July 1, 1987, this division applies to all proceedings concerning trusts commenced before July 1, 1987, unless in the opinion of the court application of a particular provision of this division would substantially interfere with the effective conduct of the proceedings or the rights of the parties and other interested persons, in which case the particular provision of this division does not apply and prior law applies."

The California Law Revision Commission Comment to section 16400 notes that it supersedes former Civil Code section 2234 which provided: "Every violation of the provisions of the preceding sections of this Article is a fraud against the beneficiary of a trust." (See Cal. Law Revision Com. com., 54A West's Ann. Prob. Code (1991 pocket supp.) § 16400, p. 753 [Deering's Ann. Prob. Code (1991 ed.) § 16400, pp. 414-415].)

[14]"A breach of trust is a violation by the trustee of any duty which as trustee he owes to the beneficiary." (Rest.2d Trusts, § 201.)

[15]Section 16002 provides in relevant part: "(a) The trustee has a duty to administer the trust solely in the interest of the beneficiaries."

Former Civil Code section 2228 is set forth in footnote 24, *post.*

Restatement Second, Trusts, *supra*, section 170, subdivision (1), provides: "The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary."

## C. *Negligence and breach of trust as grounds for denial of compensation, absent loss or damage.*

■ On settlement of each account, a trustee is entitled to reasonable compensation for services rendered. (§§ 15680-15684; former § 1122; *Estate of McLellan* (1936) 8 Cal.2d 49 [63 P.2d 1120]; *Estate of Gump, supra,* 128 Cal.App.3d 111, 116; *Estate of Cassity* (1980) 106 Cal.App.3d 569, 572 [165 Cal.Rptr. 88]; see also 11 Witkin, Summary of Cal. Law (9th ed. 1990) Trusts, § 59, pp. 942-944.) "Allowance of compensation rests in the sound discretion of the trial court, whose ruling will not be disturbed on appeal in absence of a manifest showing of abuse. (*Estate of McLaughlin* (1954) 43 Cal.2d 462, 565 . . . ; *Estate of Vokal* (1953) 121 Cal.App.2d 252, 260 . . . .)" (*Estate of Cassity, supra,* 106 Cal.App.3d at p. 572; see *Estate of Gump, supra,* 128 Cal.App.3d 111, 116; Rest.2d Trusts, *supra,* § 243.)[16]

■ Compensation may be reduced or denied where the trustee acts negligently or in breach of the trust. In *Estate of Gump, supra,* 128 Cal.App.3d 111, the court held that in view of the finding of negligence in the management of the 250 Post Street asset during the eighth account, the trial court "could in the exercise of its discretion properly deny compensation for services rendered in conjunction with the mismanaged trust asset. [Citation.]" (128 Cal.App.3d at p. 117.) However, in the absence of evidence of actual loss to the beneficiaries, the trial court's *disallowance of compensation in an amount greater than that attributable to the mismanaged lease could not be upheld* where the trustee neither acted fraudulently nor personally benefited from its negligence. (*Ibid.*)[17] Thus, the court reversed that part of the judgment denying compensation for services unrelated to the management of the leased property and remanded to allow proof of surchargeable losses, if any. (*Id.,* at p. 119.) Hence, *Estate of Gump* teaches that in the absence of fraud, personal benefit by the trustee, or loss to the beneficiaries, the trial court may only deny compensation for services attributable to the mismanaged asset.

---

[16]"If the trustee commits a breach of trust, the court may in its discretion deny him all compensation or allow him a reduced compensation or allow him full compensation." (Rest.2d Trusts, *supra,* § 243.)

[17]In *Estate of Gump,* the trustee requested compensation for ordinary services of $32,689, of which $15,373 was attributable to services relating to the Post Street property and the balance of $17,316 was attributable to services relating to other trust assets unrelated to the property. (128 Cal.App.3d at p. 115, fn. 3.) The trial court allowed $10,000 compensation, disallowing $22,689 of the requested amount. The appellate court characterized the approximately $7,300 difference between the $22,689 disallowed and the $15,373 attributable to services relating to the Post Street property as "an apparent surcharge," and concluded that "in the absence of evidence supporting an implied finding of actual loss, the additional surcharge cannot be justified. [Citation.]" (128 Cal.App.3d at p. 117.)

Section 16420, subdivision (a)(7), clearly specifies reduction or denial of compensation as a remedy available to a beneficiary for the trustee's breach of trust or threatened breach of trust.[18] This provision was added in 1986 and was drawn from section 243 of the Restatement Second of Trusts, which provides: "If the trustee commits a breach of trust, the court may in its discretion deny him all compensation or allow him a reduced compensation or allow him full compensation." (See Cal. Law Revision Com. com., 54A West's Ann. Prob. Code (1991 ed.) § 16420, p. 155 [Deering's Ann. Prob. Code (1991 ed.) § 16420, p. 423].) The comment to section 243 of the Restatement Second, makes clear that although the compensation claim may be set off against the trustee's liability for loss (Rest.2d Trusts, *supra*, § 243, com. b, p. 612), the denial of compensation may also be in addition to any liability the trustee may incur to make good a loss occasioned by the breach of trust. "When the compensation of the trustee is reduced or denied, the reduction or denial is not in the nature of an additional penalty for the breach of trust but is based upon the fact that the trustee has not rendered or has not properly rendered the services for which compensation is given." (*Id.*, com. a.)

Bogert on Trusts (2d rev. ed. 1982) (Bogert) agrees. "If a trustee has been guilty of a breach of trust it is within the discretion of the court to deny him all compensation, or to reduce his commissions below the sum which would otherwise be granted." (*Id.*, § 861, at p. 23.)[19]

Although the Probate Code, the Restatement Second, and Bogert do not expressly limit denial of compensation to services connected with the mismanaged asset absent loss, fraud, or personal benefit, *Estate of Gump, supra,* 128 Cal.App.3d 111, certainly does. We are convinced that the limitations that case places on the court's discretion to deny all compensation make sense. "Although the probate court has no authority to assess damages against a negligent trustee [citation], it is empowered to charge the trustee for shortages including denial of all or part of the trustee's claim for compensation [citations]." (*Estate of Gump, supra,* at p. 116.) Thus, denial of compensation may be one way to require the trustee to make good a loss.

[18]Section 16420 provides in relevant part:
"(a) If a trustee commits a breach of trust, or threatens to commit a breach of trust, a beneficiary . . . may commence a proceeding for any of the following purposes that is appropriate:
"
. . . . . . . . . . . . . . . . . . . . . . . .
"(7) To reduce or deny compensation of the trustee."
[19]"In the absence of statute it lies within the discretion of the court having jurisdiction over the accounting and the approval of compensation to decide whether the conduct of the trustee deserves normal, reduced, or no compensation. The court is apt to deny compensation where there has been an important breach of trust, especially if it is of a willful character. For example, compensation has been refused where the trustee failed to use ordinary care in his administration . . . ." (Bogert, *supra*, § 980, pp. 194-197, fns. omitted.)

Where there is no loss, the rationale for reducing or disallowing compensation must be that the beneficiary should not be required to compensate the trustee for services which were rendered negligently or in breach of trust. In such case, and absent evidence of fraud or self-dealing, it seems reasonable to allow compensation for services relating to trust assets which were properly managed, denying compensation only for those assets which were administered negligently or in breach of trust. This approach is consistent with section 15684 which entitles a trustee to recoup out of trust property expenditures that were not properly incurred in the administration of the trust, to the extent that they benefited the trust.[20]

The parties concede and the trial court acknowledged that beneficiaries suffered no damage during the periods of the final accounts attributable to Wells Fargo's mismanagement or breach of trust. Therefore, absent fraud or personal benefit, the trial court could disallow trustee ordinary and extraordinary compensation, expenses and attorneys' fees only so far as such compensation was sought for services in connection with the lease property.

## II.

### No substantial evidence of fraud, absent reliance and injury.

The trial court found that during the ninth and tenth account periods, Wells Fargo fraudulently misrepresented its competence and concealed and failed to disclose its incompetence to administer the lease; threatened the audit of the lease in an attempt to cover up its maladministration, to shift litigation costs to the objecting beneficiaries and to pressure objecting beneficiaries into dropping their contests and objections to the eighth account; and intentionally misrepresented in the petition to settle the final accounts its competence to administer the lease, and the services provided by the trustee and its attorneys, including the nature of the audit costs, which the court found to constitute an attempted fraud on the court. The court found this intentional misconduct constituted "actual, constructive and

---

[20]Section 15684 provides: "A trustee is entitled to the repayment out of the trust property for the following:

"(a) Expenditures that were properly incurred in the administration of the trust.

"(b) *To the extent that they benefited the trust, expenditures that were not properly incurred in the administration of the trust.*" (Italics added.)

The California Law Revision Commission comment to this section states: "Under this section, a trustee is not entitled to attorney's fees and expenses of a proceeding where it is determined that the trustee breached the trust, unless the court otherwise orders as provided in subdivision (b). See, e.g., *Estate of Gilmaker*, 226 Cal.App.2d 658, 663-65 . . . (1964); *Estate of Vokal*, 121 Cal.App.2d 252, 258-61 . . . (1953)." (Cal. Law Revision Com. com., 54 West's Ann. Prob. Code (1991 ed.) § 15684, p. 634 [Deering's Ann. Prob. Code (1991 ed.) § 15684, p. 271].)

statutory fraud against the beneficiaries" within the meaning of Civil Code sections 1571 through 1573, and former Civil Code sections 2228 and 2234.

The court further found that it might "consider evidence of Wells Fargo's negligence, fraud or breach of fiduciary duty, in the absence of any actual or compensable loss to the trust, insofar as said conduct is relevant to Wells Fargo's entitlement to its claimed fees and expenses."

Although the trial court found Wells Fargo's conduct fraudulent during the ninth and tenth accounts, it is established that no fraud occurred during the first seven accounts (*Gump I, supra*) or *during the eighth account. (Estate of Gump, supra,* 128 Cal.App.3d 111.) In *Gump I, supra,* we explained that there was no substantial evidence of extrinsic fraud as there was no evidence indicating Wells Fargo intended to deceive the beneficiaries in connection with the lease administration. As we stated: "There is no evidence Wells Fargo was even aware of the errors in rent collection until Victor Levi, an accountant hired by the beneficiaries, looked at [the lessee's] records and discovered discrepancies in the fall of 1977, the period of the eighth account." (*Gump I, supra.*) We also rejected the beneficiaries' contention that boilerplate provisions in the accounts regarding Wells Fargo's faithful conduct and management of the trusts could provide a basis for a finding of fraud. (*Ibid.*)

However, after Levi revealed the discrepancies during the period of the eighth account, there was a basis for finding Wells Fargo knew it was incompetently administering the lease. ■ We have characterized as breaches of trust Wells Fargo's conduct in failing to rectify its maladministration, failing to disclose to beneficiaries that it was not competent to administer the lease, and in threatening an audit to be charged to objecting beneficiaries. The question is whether this conduct also constitutes fraud. We believe it does not. Our review of the record discloses an absence of two elements crucial to a finding of fraud—reliance by the beneficiaries and some injury.

Nowhere in the record is there any evidence that the beneficiaries relied on Wells Fargo at any time after discovery of the rental statement discrepancies by Levi in 1977. Indeed, beneficiaries were engaged in litigation against Wells Fargo over the trusts during the ninth and tenth account periods. Beneficiaries all but concede they did not rely upon any statement or failure to disclose by Wells Fargo and they certainly did not in any way soften their litigation efforts in response to the audit threat. Rather, beneficiaries argue that reliance is not a necessary element for constructive or statutory fraud. Beneficiaries fail to cite any case authority supporting this bald assertion.

Reliance and resulting damage are clearly elements of actual fraud. (Civ. Code, § 1572; 5 Witkin, Summary of Cal. Law, *supra*, Torts, § 676, p. 778.)

Civil Code section 1573 defines constructive fraud. "Constructive fraud consists: [¶] 1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him; or [¶] 2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud." "Constructive fraud arises on a breach of duty by one in a confidential or fiduciary relationship to another which *induces justifiable reliance* by the latter *to his prejudice*. (Civ. Code, § 1573.)" (*Odorizzi* v. *Bloomfield School Dist.* (1966) 246 Cal.App.2d 123, 129 [54 Cal.Rptr. 533], italics added; see also 1 Witkin, Summary of Cal. Law, *supra*, Contracts § 406, p. 365.[21]) ■ " 'In its generic sense, constructive fraud comprises all acts, omissions and concealments involving a breach of legal or equitable duty, trust, or confidence, and resulting in damages to another. [Citations.] Constructive fraud exists in cases in which conduct, although not actually fraudulent, ought to be so treated—that is, in which such conduct is a constructive or quasi fraud, having all the actual consequences and all the legal effects of actual fraud.' (*Estate of Arbuckle* (1950) 98 Cal.App.2d 562, 568 . . . .) Constructive fraud usually arises from a breach of duty where a relation of trust and confidence exists. [Citation.]" (*Barrett* v. *Bank of America* (1986) 183 Cal.App.3d 1362, 1368-1369 [229 Cal.Rptr. 16].)

Constructive fraud allows conduct insufficient to constitute actual fraud to be treated as such where the parties stand in a fiduciary relationship. The difference between actual fraud and constructive fraud is primarily in the type of *conduct* which may be treated as fraudulent, such as a failure to disclose material facts within the knowledge of the fiduciary. Further, the reliance element is relaxed in constructive fraud to the extent we may presume reasonable reliance upon the misrepresentation or nondisclosure of the fiduciary, absent direct evidence of a lack of reliance. (*Toedter* v. *Bradshaw* (1958) 164 Cal.App.2d 200, 208 [330 P.2d 688];[22] cf., 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 406, p. 365.) Here, there is

[21]"The misrepresentation must be an inducing cause of the party's assent. (See Rest.2d, Contracts, § 167, based on Rest.2d, Torts § 546; . . .) This is so even though the defendant is in a confidential relationship . . . ." (1 Witkin, Summary of Cal. Law, *supra*, Contracts § 406, p. 365.)

[22]"It is a trustee's duty in all things to first consider and always to act for the best interests of the trust. [Citation.] Much more might be said concerning the strict supervision of trustees by courts, but the underlying policy is so well known that extended citation of authorities is unnecessary. The findings of the court that the [beneficiaries] did not rely upon the good faith of their trustee are of no avail to respondent. Under the law they had a right to so rely and in

virtually no evidence supporting any reliance by the beneficiaries upon Wells Fargo's statements or nondisclosures during the ninth and tenth accounts. Indeed, the beneficiaries all but concede the lack of reliance.

■ The thornier question is the place of reliance in what the court termed "statutory fraud." Subdivision 2 of Civil Code section 1573 states that constructive fraud consists of "any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud." Its placement in section 1573 lends credence to the identity of "statutory fraud" as a species of constructive fraud.

Respondents rely heavily on former Civil Code section 2234,[23] which was in effect during the period Wells Fargo served as trustee, to argue that the bank's breaches of trust were fraudulent. Former Civil Code section 2234 provided: "Every violation of the provisions of the preceding sections of this Article is a fraud against the beneficiary of a trust." The sections preceding former Civil Code section 2234 describing obligations of trustees included former Civil Code sections 2228 ("Trustee's obligation to good faith"),[24] 2229 ("Trustee not to use property for his own profit"), 2230 ("Certain transactions forbidden"), 2231 ("Trustee's influence not to be used for his advantage"), 2232 ("Trustee not to assume a trust adverse to interest of beneficiary"), and 2233 ("To disclose adverse interest"). These former Civil Code sections all involve either an advantage over the beneficiary or benefit gained by the trustee (implying reliance by the beneficiary to its detriment) or a conflict of interest. .

As former Civil Code section 2234 delineated by statute a type of constructive fraud, requirements are relaxed as to the type of *conduct* which may be found fraudulent, and as to the reasonableness of any reliance. Nevertheless, we are convinced that reliance and injury remain elements of this statutory fraud. We have found no case nor has any been cited to us in which trustee misconduct has been found fraudulent in the absence of some reliance by and injury to the beneficiary, however attenuated. In light of section 16400, which abandons the term "fraud" and provides that the violation of

the absence of direct evidence that they knew that he had turned against them it must be assumed that they did so rely. There is no such evidence in this record." (164 Cal.App.2d at p. 208.)

[23]Section 2234 was superseded in 1986 by Probate Code section 16400 providing that violation of a duty by the trustee is a breach of trust.

[24]Former Civil Code section 2228 provided: "In all matters connected with his trust, a trustee is bound to act in the highest good faith toward his beneficiary, and may not obtain any advantage therein over the latter by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind." This section was repealed in 1987 and was replaced by Probate Code section 16002 (duty of loyalty).

any duty by the trustee is a breach of trust (see, *ante*, p. 596), it makes sense to conclude that a breach of trust may be negligent, wilful, and/or fraudulent depending upon the circumstances, and the presence of reliance and injury. Otherwise, there would be no practical difference between a breach of trust which was merely negligent and one which was wilful and fraudulent. By definition, the breach of trust occasioned by the negligent management of trust assets would be fraudulent, regardless of reliance by or injury to the beneficiary. Such result would be contrary to the thrust of former Civil Code section 2273, also in effect at all material times, which granted the trustee repayment "of even unlawful expenditures, if they were productive of actual benefit to the estate."[25]

Further, to find fraud in the absence of reliance would appear inconsistent with *Estate of Gump, supra*, 128 Cal.App.3d 111. The court there held that compensation denied the trustee must relate to the sums sought for services rendered in connection with a mismanaged asset. If a negligent breach of trust is deemed fraudulent regardless of reliance or injury under former Civil Code section 2234, there would have been no need for the appellate court to distinguish between negligence and fraud and no reason to decide that compensation for a negligent breach of trust must relate to the mismanaged asset, because compensation could be denied entirely on the ground that a fraud had been perpetrated.

■ The trial court also found an attempted fraud on the court in misrepresentations by Wells Fargo in the petition to settle the ninth, tenth, and supplemental accounts that it had competently and faithfully managed and conducted the trusts in accordance with the will. We explicitly rejected this contention in *Gump I*, finding no support for the finding of fraud in misrepresentations of this type. We reiterated the observation of *Lazzarone* v. *Bank of America* (1986) 181 Cal.App.3d 581, 599 [226 Cal.Rptr. 855], that "nearly all executors and trustees expressly or impliedly represent that they are lawfully doing their jobs." We agreed with the conclusion of *Lazzarone*, and held that as a matter of law, "the boilerplate provisions in Wells Fargo's accounts regarding faithful conduct and management of the trusts cannot be deemed to constitute extrinsic fraud." (*Gump I, supra.*)

■ We therefore conclude that in the absence of any reliance by the beneficiaries, there is no substantial evidence supporting the trial court's finding of actual, constructive or statutory fraud by the trustee during the ninth and tenth accounts. Absent such evidence of fraud, the trial court abused its discretion in denying the trustee compensation for services rendered which were unconnected with the lease property.

---

[25]Former Civil Code section 2273 has been restated in Probate Code section 15684. (*Ante*, fn. 20.)

## III.

### *Attorney Fees Claims*

Wells Fargo sought reimbursement of $79,678.13 in attorney fees and disbursements paid to attorneys for services rendered in connection with the following: ordinary trust administration ($5,134), Wells Fargo's resignation as trustee ($4,401.27), defense of the eighth account litigation ($52,751.65), defense of the civil action ($13,795.83), and litigation costs ($3,614).[26] The trial court denied these fees entirely. Anticipating that Wells Fargo might petition in the future for the bulk of attorney fees incurred by the successor law firm in defense of the civil lawsuit resulting in *Gump I* and *Gump II*, the court also denied as a matter of law attorney fees and expenses incurred by the trustee for extraordinary services provided by attorneys in connection with the eighth account and civil litigation.

■ It is established that attorney fees and litigation costs incurred in the trustee's *successful defense* of an action brought by the beneficiary are recoverable. (*Estate of Cassity, supra,* 106 Cal.App.3d 569; cf., *Estate of Trynin* (1989) 49 Cal.3d 868, 874 [782 P.2d 232] [extraordinary services compensable under former Prob. Code, § 910, include work reasonably performed by attorneys to establish and defend their fee claim].)[27]

In *Estate of Cassity, supra,* 106 Cal.App.3d 569, the trustee sought costs, trustee's and attorneys' fees incurred in defending litigation begun by a beneficiary attempting to reopen trustee's accounts previously settled and approved by the court. The appellate court held that the trial court had abused its discretion in denying the trustee any costs or fees, notwithstanding that the trustee had been guilty of some malfeasance resulting in surcharges against him in connection with some of the accounts. The trial court had specifically found that the trustee " 'at all times acted conscientiously and in good faith and was not negligent.' " (*Id.,* at p. 574.) Most of the beneficiary's charges were disproven, the amount of the actual surcharges were but a small percentage of the total sought by the beneficiary, and the trustee had necessarily spent much time and effort protecting himself from unjust surcharge for conduct which the trial court had determined to be perfectly proper. (*Ibid.*)

---

[26]An arithmetical error of $18.75 appears in the court's calculation of extraordinary attorney fees incurred during the ninth account. As this error is de minimis and does not affect our analysis, we disregard it. (See fn. 32, *post.*)

[27]"Services that do not directly benefit the estate in the sense of increasing, protecting, or preserving it are nonetheless compensable if the estate's attorneys or representatives in performing the services were 'acting in consonance with the fiduciary duties imposed upon them' [citation]." (*Estate of Trynin, supra,* 49 Cal.3d 868, 874.)

On the other hand, an estate may not be charged with fees incurred in unsuccessfully contesting a trustee's surcharge. (*Metzenbaum* v. *Metzenbaum* (1953) 115 Cal.App.2d 395, 401-402 [252 P.2d 31].) A trustee is not entitled to attorney fees and expenses of litigation where it is determined that the trustee breached the trust, unless the court otherwise orders as provided in subdivision (b) of section 15684 where the trustee's actions resulted in a benefit to the trust. (*Estate of Gilmaker* (1964) 226 Cal.App.2d 658, 663-665 [38 Cal.Rptr. 270]; *Estate of Vokal* (1953) 121 Cal.App.2d 252, 258-261 [263 P.2d 64]; Cal. Law Revision Com., com., 54 West's Ann. Prob. Code, *supra*, § 15684, p. 634 [Deering's Ann. Prob. Code, § 15684, p. 271].)

A. *The Will.*

 Beneficiaries contend and the trial court found that the testamentary trust provisions of the will of Abraham Gump, prohibited Wells Fargo from claiming its extraordinary trustee fees, attorney fees and expenses incurred in defending the beneficiaries' claims for negligence, fraud and breach of fiduciary duty arising from Wells Fargo's maladministration of the Gump trusts incident to the civil litigation and the Eighth account litigation. We disagree.

The will provides in relevant part: "The trustees shall pay out of income of the trust estate, or if said income be insufficient, then the balance thereof out of principal, all taxes, assessments, costs, charges, fees, expenses and liabilities of every kind and nature incurred or expended in the collection, care, administration, holding, protection, handling, operating or distribution of the trust estate, for the payment of which the trust estate or the trustees may become chargeable, including the protection of this trust and its defense against legal attack, and including reasonable compensation for attorneys and for the trustee's services hereunder . . . ."

This fairly standard provision seems to us consistent with statutory and case law permitting recovery of attorney fees incurred in defense of the trustee from unwarranted and unsuccessful attack by the beneficiaries, even though such expenditure may diminish trust assets. Any other result would undermine the ability of the trustee to defend itself from unjust attack by beneficiaries. We will not reach such a result in the absence of a clear expression of the testator's intent to deny fees in such a case.

B. *Eighth Account Litigation Fees.*

We agree with the trial court that Wells Fargo did not prevail in the eighth account litigation which resulted in *Estate of Gump, supra,* 128 Cal.App.3d

111. Though the appeal resulted in a partial reversal, it left intact the trial court's finding of Wells Fargo's negligent breaches of trust in administering the leased property. Moreover, the beneficiaries not only succeeded in their claim of trustee negligence, but also succeeded in large part on the appeal, by obtaining affirmance of the denial of $15,373 in trustee's fees connected with administration of the property.[28] This case is thus significantly different from *Estate of Cassity, supra*, 106 Cal.App.3d 569, where the trustee was negligent in some respects, but the vast majority of the beneficiary's claims were baseless and it was found that the trustee had acted at all times in good faith.

C. *Attorney fees for the civil litigation—Gump I and Gump II.*

We conclude that the trial court's denial of all attorney fees in connection with the civil litigation stands on a different footing than its denial of attorney fees for the eighth account. As recognized by the trial court, Wells Fargo clearly prevailed in the civil litigation resulting in *Gump I, supra,* and *Gump II, supra.* The bank succeeded in almost all significant respects in defending the beneficiaries' challenge to its administration of trust.[29]

Nevertheless, the trial court entirely disallowed extraordinary trustee fees, attorney fees and expenses incurred by Wells Fargo in its defense of this civil litigation on the grounds that the fees sought were "unreasonable" and by reason of the court's findings of Wells Fargo's negligent and intentional maladministration of the leased property, its breaches of trust, and its fraud. The court also found that the fees were not properly incurred nor did they benefit the estate within the meaning of former Civil Code section 2273, that Wells Fargo failed to meet the criteria of *Estate of Cassity, supra*, 106 Cal.App.3d 569, for reimbursement of trustee's extraordinary litigation fees and expenses, to wit, that the trustee at all times act conscientiously and in good faith and conduct its administration of the trust in a proper manner. Finally, the court found "that it would be highly inequitable to require the

[28]The trial court in *Estate of Gump, supra,* had disallowed $22,689 of requested trustee compensation. The appellate court found the record inadequate to disclose the evidentiary basis for disallowance of $7,300 of that sum and reversed to allow evidence of loss which might support such additional surcharge. On remand, the trial court found Wells Fargo's negligence during the eighth account caused damages in lost rents of $3,355.17 and included such amount in its damage award in *Gump I, supra.* On appeal in *Gump I, supra,* this part of the award was unchallenged.

[29]Specifically, *Gump I, supra,* held in relevant part: (1) res judicata barred reopening of the first seven accounts; (2) the trial court finding of fraud was unsupported by substantial evidence; (3) as a consequence, the evidence did not support the $1 million punitive damages award; and (4) substantial evidence supported the trial court's finding that the beneficiaries' unclean hands prevented them from claiming damages for losses suffered during the ninth and tenth accounts.

beneficiaries, who were the victims of Wells Fargo's negligence . . . fraud and intentional breaches of trust and fiduciary duty, to pay Wells Fargo's legal fees and expenses incurred in the civil litigation . . . which was precipitated by the Bank's actual misconduct."

 Wells Fargo argues that *Gump I, supra,* establishes that its administration of the leased property during the first seven accounts was not negligent, that it acted in good faith and committed no fraud as to those accounts. Beneficiaries counter that Wells Fargo may not use *Gump I, supra,* to support its entitlement to fees as the res judicata determination there was a "technical defense" unrelated to the merits of beneficiaries' negligence claim and that Wells Fargo may not use the res judicata holding of *Gump I, supra,* offensively to establish its fee entitlement.

In *Gump I, supra,* we held approval of the first seven accounts in the probate proceeding was res judicata, barring beneficiaries' claims of negligence and breach of trust against Wells Fargo. In reaching that conclusion, we said:

"The law charges the probate court with the duty of scrutinizing the accounts of an executor and trustee and determining the issues presented by a petition for approval of the accounts. [Citations.] 'The "issues presented" by the petition include not only the account's arithmetical accuracy but also whether the trust has been mismanaged. Approval of the account thus negates a claim of mismanagement. [¶] . . . the probate court, in the exercise of its duty to scrutinize Bank's management of the trust with care, necessarily determined that Bank had carefully and prudently managed the trust. This determination, in turn, necessarily encompassed a rejection of any claims that the trustee had defrauded plaintiff, a beneficiary.' (*Lazzarone* v. *Bank of America* [1986] 181 Cal.App.3d [581] at p. 594, citations and footnote omitted.) No reason appears why the present claims that Wells Fargo improperly administered the 250 Post Street lease could not have been made in the earlier probate proceedings. This being true, and considering the need to maintain the significance of probate proceedings, it is of no moment that such claims were not then advanced. The law disfavors the avoidance of probate proceedings and the litigation on the law side of the court of matters properly heard and resolved in probate. (*Bank of America* v. *Superior Court* (1986) 181 Cal.App.3d 705, 717 [226 Cal.Rptr. 685].) The belated claims are now barred by the doctrine of res judicata." (*Gump I, supra.*)

The foregoing reasoning mandates our rejection of beneficiaries' assertion that res judicata is a mere "technical defense" which equity may disregard.[30] Res judicata refers to a thing or matter settled by judgment—here, that Wells Fargo properly managed the trust assets during the first seven account periods.

■ "A final judgment is res judicata *only if it was rendered on the merits.* This requirement is derived from the fundamental policy of the doctrine, which gives stability to judgments after the parties have had a fair opportunity to litigate their claims and defenses. [Citations.] [¶] The judgment is on the merits if the substance of the claim is tried and determined, no matter how wrongly it is decided." (7 Witkin, Cal. Procedure (3d ed. 1985) Judgment, § 217, pp. 654-655, italics added; accord *Smith* v. *Smith* (1981) 127 Cal.App.3d 203, 209 [179 Cal.Rptr. 492], [postdivorce ruling that divorce decree was res judicata on status of retirement benefits as community property barred further attempt to recover benefits].)

■ Beneficiaries contend that in seeking to recover its attorney fees, Wells Fargo is attempting the offensive use of collateral estoppel, which the trial court may refuse. We disagree. ■ The offensive use of collateral estoppel occurs when a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against the same or a different party. (*United States* v. *Mendoza* (1984) 464 U.S. 154, 159, fn. 4 [78 L.Ed.2d 379, 384, 104 S.Ct. 568].) "Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. Under the doctrine of collateral estoppel, on the other hand, the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action. [Citations.]" (*Parklane Hosiery Co.* v. *Shore* (1979) 439 U.S. 322, 326, fn. 5 [58 L.Ed.2d 552, 559, 99 S.Ct. 645].) In *Parklane Hosiery Co.* v. *Shore, supra,* upon which beneficiaries rely, the Supreme Court articulated a general rule, allowing federal courts broad discretion to determine when collateral estoppel could be applied offensively, but refusing to allow its use where, for instance, defendant was sued in the first action "for small or nominal damages" and has "little incentive to defend vigorously" or "if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant." (*Id.,* at pp. 330-331 [58 L.Ed.2d at pp.

---

[30]In this respect, *Gump I, supra,* is unlike *Harvey* v. *Leonard* (Iowa 1978) 268 N.W.2d 504, relied upon by beneficiaries. In that case, the court denied attorneys' fees to a trustee who despite breaching his fiduciary duties, prevailed in litigation under defenses of the statute of limitations and laches.

561-562], fn. omitted.) ▮▮ We believe res judicata is the doctrine properly applied in this case. However, assuming for the sake of argument that Wells Fargo was seeking to use collateral estoppel offensively, we see no objection to doing so here, where Wells Fargo and the beneficiaries were parties to the initial probate court accountings and to the civil litigation that culminated in *Gump I.* None of the considerations discussed by the Supreme Court in *Parklane Hosiery Co.* as militating against the applicablility of collateral estoppel in some circumstances are present here. Our conclusion in *Gump I,* that the probate judgments on the first seven accounts was res judicata, necessarily determined that beneficiaries had sufficient incentive to pursue their claims in the probate proceedings. (See *Gump I, supra.*) Certainly beneficiaries vigorously litigated their civil action and the subsequent appeal which culminated in *Gump I.*

We therefore conclude that in prevailing in *Gump I* on its res judicata defense, Wells Fargo established as law of the case that it was not negligent in its administration of the lease during the first seven accounts, and that it did not breach its fiduciary duty to beneficiaries during those account periods.

Nor does our observation in *Gump I* that "[t]here is abundant evidence Wells Fargo was negligent in administering the lease" warrant a different conclusion. Beneficiaries seize upon that sentence, without regard to its context. In context, the sentence pointed out that to justify reopening the accounts there must be substantial evidence of extrinsic fraud. Although abundant evidence of Wells Fargo's negligence was provided, we found no substantial evidence that it engaged in fraud. The strength of the evidence of Wells Fargo's negligence has no bearing upon the res judicata effect given the probate decrees closing the first seven accounts. That determination establishes as a matter of law that Wells Fargo properly administered the lease during the periods of the first seven accounts.

Therefore, the trial court's denial of attorney fees was unsupported to the extent that it rested upon a finding that the attorney fees and litigation expenses incurred during the civil litigation "involved defense of Wells Fargo's maladministration of the 250 Post Street lease."

The court's denial of fees for the civil litigation was based in part upon its erroneous determination that Wells Fargo acted improperly during the first seven accounts. ▮▮ Nevertheless, it is clear the court also denied fees based upon Wells Fargo's negligence and breaches of trust during the eighth,

ninth and tenth accounts as well.[31] The question becomes whether Wells Fargo's negligence and breaches of trust *during the ninth and tenth account periods* can justify the court's denial of all attorney fees for the civil litigation. More specifically, does Wells Fargo's intentional breach of trust in using the threat of an audit to gain an advantage during the eighth account and civil litigation warrant denial of all fees for that litigation?

We believe it does. The trial court found that Wells Fargo breached its trust in threatening an audit to be charged solely to objecting beneficiaries in an attempt to intimidate them and to pressure them into dropping the eighth account litigation. Although the court did not find specifically that the audit threat also was aimed at intimidating beneficiaries in connection with the pending civil litigation, we can infer such finding as the audit covered periods at least two years before the eighth account and if intended as a threat to litigation, as the trial court found, the threat would be the same for both the eighth account litigation and the civil litigation.

The trial court exercises its equitable powers in determining whether trustee misconduct or breach of trust warrants reduction or denial of attorney fees. We are loath to interfere with the exercise of that discretion absent some compelling legal constraint upon the equitable powers of the judge. Section 16420, subdivision (a)(7), provides ample authority for the court's exercise of discretion to deny fees in cases of trustee misconduct. The relevant case authority, while providing a check upon the unlimited exercise of discretion to deny fees to a trustee who in good faith successfully defends itself from unwarranted beneficiaries' charges (see *Estate of Cassity, supra,* 106 Cal.App.3d 569), does not address the issue whether breaches of trust committed during a later account may justify denial of fees incurred in litigation over a previous account. We are persuaded that in the circumstances here presented, where the breaches of trust not only occurred during the period of litigating the eighth account and civil action, but were in part committed in an attempt to obtain an advantage in the litigation, the court had discretion to deny extraordinary attorneys' fees for litigation services in their entirety.

### Conclusion

The vast majority of the requested trustee compensation, attorney fees and costs denied by the trial court was incurred for services relating to

---

[31]The court expressly exercised its equitable discretion to deny fees for Wells Fargo's breaches of trust during the ninth and tenth accounts pursuant to section 16420, subdivision (a)(7), and to deter trustee misconduct.

administration of the lease property or to the litigation surrounding that administration. The court did not abuse its discretion in denying compensation for those services and costs.[32]

The trial court abused its discretion in denying entirely ordinary trustee's fees and ordinary attorney fees for services *unconnected* with administration of the lease property or the related litigation. It is unclear from the record what portion of the following were incurred for services unrelated to the lease property or the litigation surrounding it: Ordinary trustees fees for the ninth account ($34,892); ordinary trustees fees for the tenth account ($17,298); ordinary attorney fees for the ninth, tenth and supplemental accounts ($5,134). For reasons explained, *ante*, at pages 598-600, we reverse the judgment insofar as it denied compensation for these items. We remand that part of the judgment to the trial court to determine what portion of the services rendered was unconnected with the lease property and the surrounding litigation and to allow reasonable compensation for those services.

---

[32]Summary of requested compensation and its relation to the lease property:

*Ninth Account: Ordinary Trustee Compensation ($34,892).* It is unclear how much of this sum was for services unconnected with the property.

*Tenth Account: Ordinary Trustee Compensation ($17,298).* It is unclear how much of this sum was for services unconnected with the property. (A difference of $100 appears between the court's calculation and the trustee's request. On remand, the court may determine the correct sum.)

*Supplemental Account: Ordinary Trustee Compensation ($6,000).* The court did not abuse its discretion in denying compensation for this item as it found no record evidence the trustee performed ordinary services during this period.

*Ninth, Tenth and Supplemental Accounts: Extraordinary Trustee Compensation ($16,000).* All items related to the lease, except for $3,769.33 in compensation allowed by the trial court for services regarding trustee resignation, fiduciary tax return preparation, and the like.

*Ninth, Tenth and Supplemental Accounts: Ordinary Attorneys' Fees ($5,134).* It is unclear what portion of these fees was incurred for services unconnected with the lease property or the litigation.

*Ninth, Tenth and Supplemental Accounts: Extraordinary Attorneys' Fees ($70,920.75).* All fees related to the eighth account litigation ($52,751.65) or to the civil action ($13,795.83), except for $4,401.27 incurred in connection with the trustee resignation. As to the latter sum, there was no abuse of discretion as the trial court found no record evidence that such sums were incurred. (An arithmetical error of approximately $19 appears in the court's calculation of the ninth account. As this error is de minimis and does not affect our determination, we disregard it.)

*Audit Expense ($21,150).* This cost was connected with the property.

*Litigation Expense ($3,614.38).* This expense was incurred in connection with the litigation. (The Statement of Decision states this figure as $3,164.38, apparently the result of a transposition error.)

*Eighth Account and Civil Litigation Extraordinary Attorney Fees.* Although counsel did not petition for fees, the fees denied by the court clearly related to the eighth account and civil litigation involving the lease property.

In all other respects, the judgment is affirmed. Each party is to bear its own costs on appeal.

Benson, J., and Peterson, J., concurred.

A petition for a rehearing was denied January 3, 1992, and appellant's petition for review by the Supreme Court was denied March 19, 1992. Baxter, J., did not participate therein.